UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
INTERNATIONAL HOME CARE SERVICES
OF NEW YORK, LLC,

                    Plaintiff,                    **MEMORANDUM & ORDER**
                                                                20-CV-3358 (PKC) (SJB)
         - against -

PEOPLE'S UNITED BANK, NATIONAL
ASSOCIATION,

                    Defendant.
-------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

In this breach-of-contract action removed from state court, Plaintiff seeks entry of a preliminary injunction removing a hold placed on funds in Plaintiff's bank account with Defendant, and releasing certain funds from that account to Plaintiff. For the reasons stated herein, Plaintiff's motion for entry of a preliminary injunction is denied.

## BACKGROUND

### I.    Findings of Fact

Pursuant to Federal Rule of Civil Procedure 52(a)(2), the Court makes the following findings of fact in support of its denial of a preliminary injunction against Defendant.

In March 2013, Plaintiff opened a business deposit account (the "Account") at Defendant People's United Bank, National Association ("Defendant" or the "Bank"). (Affidavit of Frank Ryan ("Ryan Aff."), Dkt. 13, ¶ 4.) The Account was governed by a contract setting forth certain terms and conditions. (*Id.* ¶¶ 5–6; *see also* Signature Card, Dkt. 13-1; Business Deposit Account Contract, Dkt. 13-2.) On August 28, 2018, Defendant extended two asset-based loans to Plaintiff in the combined amount of $3.5 million: a secured term loan note for $1,900,000 (the "Term Note"), and a secured revolving credit loan note for $1,600,000 (the "Revolving Credit Note")

1

(collectively, the "Notes"), for which Plaintiff executed a Security Agreement. (Ryan Aff., Dkt. 13, ¶¶ 7–8, 11; Affidavit of Irina Elnatanova ("Elnatanova Aff."), Dkt. 9-1, ¶ 3; Security Agreement, Dkt. 9-10.) The Security Agreement included a provision on "Collateral Security," whereby Defendant had a right to set off any deposits against any amounts owed by Plaintiff, whether or not such amounts were then due. (Ryan Aff., Dkt. 13, ¶ 9; Term Note, Dkt. 9-7, at 5; Revolving Credit Note, Dkt. 9-9, at 8.) Both Notes are governed by a number of financial covenants and reporting requirements. (Ryan Aff., Dkt. 13, ¶ 11; Guaranty of Payment and Performance, Dkt. 9-8.)

In October 2018, Defendant informed Plaintiff that Defendant intended to conduct a field audit of Plaintiff's accounts receivable in accordance with the reporting requirements, but Plaintiff did not schedule the audit. (Ryan Aff., Dkt. 13, ¶¶ 13–14; Email communications, Dkt. 13-3.) On or about September 20, 2019, Defendant notified Plaintiff that the Revolving Credit Note had matured and that Plaintiff's refusal to permit a field audit was an Event of Default under the terms of both Notes. (Ryan Aff., Dkt. 13, ¶ 15; Sept. 20, 2019 Letter, Dkt. 13-4.) Plaintiff responded that it would permit the field audit, and, on September 27, 2019, the parties extended the term of the Revolving Credit Note to December 26, 2019. (Ryan Aff., Dkt. 13, ¶ 15; Administrative Extension Letter, Dkt. 13-5.) Plaintiff still did not schedule a field audit, and, on November 18, 2019, Defendant again notified Plaintiff that this failure constituted an Event of Default and further informed Plaintiff that Defendant would institute a default rate of interest on both Notes. (Ryan Aff., Dkt. 13, ¶ 16; Nov. 18, 2019 Letter, Dkt. 13-6.) After Plaintiff indicated that it intended to refinance the loan with a different bank, Defendant again extended the maturity date of the Revolving Credit Note to January 31, 2020. (Ryan Aff., Dkt. 13, ¶ 17.) On or about February 27, 2020, Defendant agreed to further extend the maturity date of the Revolving Credit Note to May

31, 2020 so that Plaintiff could schedule the field audit. (*Id.* ¶ 18; Elnatanova Aff., Dkt. 9-1, ¶ 3; Revolving Credit Note, Dkt. 9-9.)

When the COVID-19 pandemic first caused shutdowns in the New York City area, Defendant granted Plaintiff's March 25, 2020 request to defer payment on both Notes (*see* Dkt. 9-11), and, on April 21, 2020, Defendant allowed a three-month deferment of monthly payments on the Term Note, but not on the Revolving Credit Note (Ryan Aff., Dkt. 13, ¶¶ 22–23; Notice of Payment Adjustment, Dkt. 9-14). In April 2020, Plaintiff obtained a Paycheck Protection Program ("PPP") loan through a different bank (*see* Dkt. 13-14), and the balance in the Account increased (Ryan Aff., Dkt. 13, ¶ 25). However, Defendant states that it "could not depend on the funds in the Account as sufficient collateral because Plaintiff, at that time, could have withdrawn the entire balance from the Account at any moment." (*Id.*)[1]

As the Revolving Credit Note was to mature on May 31, 2020, the parties conferred on May 7, 2020 about a possible extension. (*Id.* ¶ 26.)[2] Defendant sent follow-up emails to Plaintiff listing the records needed for an extension, but Plaintiff responded to neither these emails nor to emails from the field auditor hired by Defendant. (*Id.* ¶¶ 28–31.) The term of the Revolving Credit Note expired on May 31, 2020. (*Id.* ¶ 32.) Defendant prepared a Forbearance and Amendment Agreement (Dkt. 13-13), but Plaintiff again did not respond (Ryan Aff., Dkt. 13, ¶ 33). On June 10, 2020, Defendant informed Plaintiff that, due to Plaintiff's ongoing default, the principal

---

[1] This is presumably because Defendant had not received financial reports from Plaintiff for January, February, March, and April 2020. (Ryan Aff., Dkt. 13, ¶¶ 19–20.) Plaintiff disputes this and maintains that "[a]ll of these reports, except for the May 2020, were provided prior to the pandemic on-set (and alleged default notices)." (Elnatanova Aff., Dkt. 9-1, ¶ 7.)

[2] According to Plaintiff, Defendant in this conversation "stated that the revolving credit note would be extended and forbeared for at least 90 days beyond May 31, 2020" (Elnatanova Aff., Dkt. 9-1, ¶ 4), which Defendant maintains is "simply false" (Ryan Aff., Dkt. 13, ¶ 27).

balance of both Notes, in addition to accrued interest and other charges, was due and payable, and that Defendant was both (1) setting off funds in the Account to pay the amount due on the Revolving Credit Note, and (2) placing a hold on the remaining funds in the Account to set them off against the balance of the Term Note. (*Id.* ¶ 34; Elnatanova Aff., Dkt. 9-1, ¶ 5.) On June 16, 2020, Plaintiff was informed that the $1,604,516.67 amount in the Account had actually been set off. (Elnatanova Aff., Dkt. 9-1, ¶ 5; June 16, 2020 Letter, Dkt. 9-5.)

## II. Procedural History

Plaintiff commenced this action in New York Supreme Court, Queens County, on June 26, 2020 (Complaint ("Compl."), Dkt. 1-1) and simultaneously moved for an order to show cause ("OSC") for the issuance of a preliminary injunction requiring Defendant to reverse the set-off and release its hold on the Account (Dkt. 1-2, at ECF[3] 2–3). On June 30, 2020, the state court issued an OSC for the parties to appear at a hearing on July 9, 2020, and also issued a temporary restraining order ("TRO") whereby $250,000 of the money set off and on hold against the Account was released to Plaintiff. (*Id.*) On July 9, 2020, following the TRO hearing, the state court issued a memorandum directing that the TRO be continued until the preliminary injunction ("PI") motion was resolved, and ordered a submission date for briefing on the PI motion. (Dkt. 1-3.) The PI motion was fully briefed on July 27, 2020, on which date Defendant removed this action from state court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.[4] (Notice of Removal, Dkt. 1.) Thereafter

---

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[4] Defendant's removal was timely pursuant to 28 U.S.C. § 1446(b), which requires that the notice of removal be filed within 30 days of the defendant's receipt by service of the initial pleading.

4

the parties filed the state court record and PI motion papers[5] for consideration by this Court. (*See* Aug. 6, 2020 Order; Dkts. 9–14.)[6]

## LEGAL STANDARD

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). In order to receive a preliminary injunction, a plaintiff must show

> (1) "a likelihood of success on the merits," (2) "that the plaintiff is likely to suffer irreparable injury in the absence of an injunction," (3) that "the balance of hardships tips in the plaintiff's favor," and (4) "that the public interest would not be disserved by the issuance of the injunction."

*Capstone Logistics Holdings, Inc. v. Navarrete*, 736 F. App'x 25, 25–26 (2d Cir. 2018) (summary order) (alterations omitted) (quoting *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010)). "The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citation omitted); *see also Am. C.L. Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015) ("A preliminary injunction is an equitable remedy and an act of discretion by the court."). "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (citation and footnote omitted).

---

[5] *See* Fed. R. Civ. P. 81(c)(2) ("After removal, repleading is unnecessary unless the court orders it.").

[6] Because the parties appeared in state court for the July 9, 2020 TRO hearing (*see* Transcript, Dkt. 12-2), which addressed many of the issues discussed herein, the Court has declined to schedule oral argument on Plaintiff's PI motion.

5

**CONCLUSIONS OF LAW**

Plaintiff seeks a preliminary injunction compelling Defendant both to release the $1,640.516.67 set-off amount and to remove the hold on the $1,055,000 amount remaining in the Account. (Elnatanova Aff., Dkt. 9-1, ¶¶ 1, 10.)

**I.      Mandatory Preliminary Injunction**

"Courts refer to preliminary injunctions as prohibitory or mandatory." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). While a "[p]rohibitory injunction[] maintain[s] the status quo pending resolution of the case[,] [a] mandatory injunction[] alter[s] it." *Id.* at 36–37 (citation omitted). The status quo in the context of a preliminary injunction is "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam) (internal quotation and citation omitted). A party moving for a mandatory injunction, or an injunction that "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits" must satisfy a heightened legal standard and both: "(1) make a strong showing of irreparable harm, and (2) demonstrate a clear or substantial likelihood of success on the merits." *Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020) (internal quotation and footnotes omitted).

Defendant argues that Plaintiff's requested preliminary injunction is mandatory because it will "disturb the status quo and afford Plaintiff the ultimate relief sought in the Complaint." (Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction, Dkt. 13-15, at 4.) While Plaintiff's initial motion papers do not specify the type of preliminary injunction sought (*see* Emergency Affirmation in Support ("Iovino Affirm."), Dkt. 9-3, ¶ 3),

6

Plaintiff's counsel acknowledged at the TRO hearing that Plaintiff was seeking a "mandatory injunction" (*see* Dkt. 12-2, at ECF 22).[7]

The Court finds that Plaintiff is seeking a mandatory preliminary injunction, as Plaintiff's PI motion requests relief identical to the relief sought in the First Cause of Action in the Complaint, namely, "a permanent injunction against [Defendant] ordering [Defendant] to reverse and release to [Plaintiff] the $1,604,516.67 set-off and release the current approximate $1,055,000.00 hold from [the Account]." (Compl., Dkt. 1-1, ¶ 29.) The Court thus applies the "heightened legal standard" appropriate for evaluating a mandatory preliminary injunction. *N. Am. Soccer League, LLC*, 883 F.3d at 37 (citation omitted).[8]

## II. Irreparable Harm

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction, and the moving party must show that injury is likely before the other requirements for an injunction will be considered." *Allstate Ins. Co. v. Elzanaty*, 929 F. Supp. 2d 199, 221 (E.D.N.Y. 2013) (alterations omitted) (quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)). In order to show irreparable harm, the moving party must establish

---

[7] While both parties' filings cite New York law in their analysis of Plaintiff's PI motion, the Court applies federal law. "The question whether a preliminary injunction should be granted is generally one of federal law even in diversity actions, though state law issues are sometimes relevant to the decision to grant or deny." *Sterling v. Deutsche Bank Nat'l Tr. Co.*, 368 F. Supp. 3d 723, 727 n.7 (S.D.N.Y. 2019) (quoting *Baker's Aid v. Hussmann Foodserv. Co.*, 830 F.2d 13, 15 (2d Cir. 1987)). However, even were the Court to apply New York law in deciding Plaintiff's PI motion, it would arrive at the same conclusion given the substantial similarity of the showings that Plaintiff must make under either state or federal law. *See Shake Shack Fulton St. Brooklyn, LLC v. Allied Prop. Grp., LLC*, 112 N.Y.S.3d 196, 199–200 (App. Div. 2019) ("A mandatory injunction, which is used to compel the performance of an act, is an extraordinary and drastic remedy which is rarely granted and then only under unusual circumstances where such relief is essential to maintain the status quo pending trial of the action." (collecting cases)).

[8] The Court further notes that, regardless of how the preliminary injunction is characterized, Plaintiff has failed to make a showing of irreparable harm—a prerequisite to injunctive relief under the legal standard for either a mandatory or prohibitory preliminary injunction.

7

that "'there is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'" *Id.* (quoting *Kamerling*, 295 F. 3d at 214); *see also Allstate Ins. Co. v. Harvey Fam. Chiropractic*, 677 F. App'x 716, 718 (2d Cir. 2017) (summary order) ("Irreparable harm exists where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." (internal quotation and citation omitted)). Additionally, "irreparable harm must be shown to be actual and imminent, not remote or speculative." *Elzanaty*, 929 F. Supp. 2d at 221 (internal quotation and citation omitted).

Here, Plaintiff fails to make a "strong showing" of irreparable harm as required for a mandatory preliminary injunction. *See Yang*, 960 F.3d at 128 (citation omitted). Plaintiff argues that Defendant's set-off was "a shot to the vital beating heart of [Plaintiff]" that has "jeopardized the entire company and its staff," leaving "[Plaintiff] adrift in the economic sea." (Elnatanova Aff., Dkt. 9-1, ¶¶ 5, 8.) In support, Plaintiff has attached "various examples of payments that had been stopped or dis-honored because of [Defendant's] actions," which "include a failure to transfer $76,374.56; a $25,000.00 overdraft charge [on] which [Plaintiff] is paying a needlessly high interest rate; a $3,370.73 dishonored [] payment for workman's compensation costs; and [] dishonored [] payments of $333.69 and $836.95." (*Id.* ¶ 9 (citing Dkt. 9-21).) Plaintiff adds that it "risks statutory penalties for failing to abide by regulations pertaining to the minimum payments to its aides," and that, "because of [D]efendant's action and bad faith, [Plaintiff's] payroll is

8

running a $5,000.00 to $75,000.00 per week shortfall." (*Id.*)[9] Plaintiff also filed with its reply papers accounting documents for April 2020 and the year 2019. (*See* Dkts. 12-3, 12-4.)[10]

However, Plaintiff has not shown via these or any other financial records that it will suffer irreparable harm absent a mandatory preliminary injunction. Rather, Plaintiff broadly claims that it "continues to suffer financially" and that "[a] continuation of this state of affairs risks . . . the continued existence of our company." (Reply Aff., Dkt. 12-1, ¶ 6.)[11] But a "risk[]" to Plaintiff's existence is not a strong showing of irreparable harm. While "[c]ourts have found irreparable harm when plaintiffs allege that their business would be shut down entirely if relief is not granted," *Amato v. Elicker*, No. 20-CV-464 (MPS), 2020 WL 2542788, at *6 (D. Conn. May 19, 2020) (collecting cases), Plaintiff stops short of making such a dire allegation.

Plaintiff simply highlights various payments that it argues are examples of ongoing losses and financial handicaps that may eventually destroy its business (Dkt. 9-21), but provides no

---

[9] Plaintiff does not further explain this shortfall or the nature of its rather significant range.

[10] Plaintiff's stated reason for submitting these documents is "[a]s a demonstration of the lack of danger to [Plaintiff] and as a show of further good faith," and as a rebuttal to the "five alleged defaults relied on by [Defendant]." (Reply Affidavit ("Reply Aff."), Dkt. 12-1, ¶ 3.) The Court infers that Plaintiff's reference to its "lack of danger" is meant to support the argument that Plaintiff would not have defaulted on any payments to Defendant. However, any stated "lack of [financial] danger" to Plaintiff plainly undercuts Plaintiff's contrary assertion that it will suffer irreparable harm to its financial viability absent a preliminary injunction.

[11] In fact, the affirmation by Plaintiff's counsel does not actually assert that Plaintiff faces irreparable harm. Plaintiff's counsel states merely that,

> [o]n information and belief, vendor payments, wire transfers into and out of [Plaintiff's] business account, payroll expenditures and actual employment have been severely hamstrung. A continuation of this state of affairs will, I am told, jeopardize [Plaintiff's] existence . . . . The situation for [Plaintiff], I am told, is now critical.

(Iovino Affirm., Dkt. 9-3, ¶ 9.) These second-hand, qualified, unsupported representations by Plaintiff's counsel are clearly insufficient to justify the requested preliminary injunction.

information as to its overall financial well-being and, indeed, specifically neglects to mention its other accounts—for example, its loan application funded by Santander Bank (*see* Ryan Aff., Dkt. 13, ¶¶ 24, 25; Dkt. 13-14 (showing in email correspondence by both parties that Plaintiff applied for a loan with Santander and requested to withdraw its application with Defendant)). Furthermore, to the extent Plaintiff suggests that the COVID-19 shutdown increased the likelihood that Plaintiff may go out of business (*see, e.g.*, Elnatanova Aff., Dkt. 9-1, ¶ 4), Plaintiff has adduced no evidence to support that claim, and the Court rejects it. *See Amato*, 2020 WL 2542788, at *6 (finding that, in the context of the COVID-19 pandemic, a bar's challenge to state and municipal shut-down orders did not allege sufficient facts to make a "clear showing that irreparable injury is *likely* in the absence of an injunction . . . [since plaintiffs] do not allege or testify to any facts suggesting that permanent closure of their business is likely or imminent" (emphasis in original) (internal quotation and citation omitted)); *see also Winter*, 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." (emphasis in original) (collecting cases)).

Plaintiffs have also failed to demonstrate that any business losses they might suffer cannot be compensated with money damages when this case is finally resolved.[12] "[A]ny injury that can be remedied in money damages is the antithesis of irreparable harm, and such a fact requires that the Court not find an irreparable injury." *Sunni, LLC v. Edible Arrangements, Inc.*, No. 14-CV-461 (KPF), 2014 WL 1226210, at *9 (S.D.N.Y. Mar. 25, 2014) (internal quotation and citation

---

[12] At the TRO hearing, Plaintiff's counsel argued that "[a]ny judgment that [his] client would receive at the end of this case, which could come years from now, by then, the company will be out of business. They will be dead." (Dkt. 12-2, at ECF 10.) However, without evidence indicating as much, the Court is not persuaded by this conclusory assertion.

omitted)[13]; *see also Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (finding no irreparable injury where lost profits could be easily calculated from the previous years' financial records). Other than the conclusory assertions that its business may close, Plaintiff has not proffered evidence showing that its business could not be returned to the *status quo ante* with money damages at the conclusion of this case.

Accordingly, because Plaintiff has failed to demonstrate that it will suffer irreparable harm if a preliminary injunction is not granted,[14] the Court denies Plaintiff's PI motion.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for a preliminary injunction is denied.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 24, 2020
Brooklyn, New York

---

[13] The plaintiffs in *Sunni* requested a preliminary injunction, claiming irreparable harm due to the destruction of their retail franchise stores. 2014 WL 1226210, at *1. The court denied the request because the plaintiffs had "submitted no evidence regarding their current capitalization, their annual or monthly profits, or their ability to withstand a significant loss in business, or even closure, for a short period of time." *Id.* at *11.

[14] "[T]he moving party must show that injury is likely before the other requirements for an injunction will be considered." *Elzanaty*, 929 F. Supp. 2d at 221 (internal quotation and citation omitted). The Court, therefore, need not, and does not, resolve whether Plaintiff has a high likelihood of succeeding on the merits, whether Plaintiff has demonstrated "a balance of hardships tipping decidedly" in Plaintiff's favor, or whether the public interest would not be disserved by the granting of a preliminary injunction. *See Navarrete*, 736 F. App'x at 25–26 (internal quotation and citation omitted).